

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed April 15, 2019**

**United States Bankruptcy Judge**

_____

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | **CASE NO. 18-33108-BJH** |
| | § | **(Chapter 7)** |
| **ESSENTIAL FINANCIAL** | § | |
| **EDUCATION, INC.,** | § | **Related to ECF No. 10** |
| | § | |
| **Debtor.** | § | |

**MEMORANDUM OPINION DENYING MOTION OF
OTA FRANCHISE CORPORATION FOR DISMISSAL OR
ABSTENTION UNDER 11 U.S.C. §§ 707(a) AND 305(a)(1)**

Essential Financial Education, Inc. ("**Essential**") entered bankruptcy on November 15,

2018 after it failed to controvert a petition for involuntary relief filed by Gary Flick. OTA

Franchise Corporation ("**OTA**"), former franchisor of the involuntary debtor, now moves to

dismiss the bankruptcy as having been filed in bad faith and for other reasons. Alternatively, it asks the court to abstain from hearing the case.[1]

This Memorandum Opinion comprises the court's finding of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052, made applicable by Fed. R. Bankr. P. 9014(c).

## I.       Jurisdiction

The court has jurisdiction over the Motion under 28 U.S.C. § 1334(b); this is a core proceeding under 28 U.S.C. § 157(b)(2)(A).

## II.      Factual and Procedural History

### A.       Essential, OTA and the OTA Franchise Agreement

Thomas Caufield formed Essential to operate "Online Trading Academy-Dallas" ("**OTA-Dallas**") a school offering instruction in financial management and strategies for securities investing and trading.[2] Caufield himself had been a franchisee of OTA but at some point in 2015 and for reasons not made part of the record elected to do business through Essential. He capitalized the debtor with assets that included his contract rights as an OTA franchisee.[3]

Two years later Caufield and Essential violated the terms of the OTA franchise agreement by soliciting loans and investments from others, including OTA-Dallas students.[4] Gene Longobardi, OTA's Chief Operating Officer, testified that Caufield disclosed to OTA on November 24, 2017 that the Securities and Exchange Commission was investigating him for improperly soliciting investments in high-yield promissory notes by misrepresenting, among other

---

[1]  Motion for Dismissal or Abstention Under 11 U.S.C. §§ 707(a) and 305(a)(1) [ECF No. 10] (the "**Motion**").

[2]  GGF Ex. 38 (Asset Contribution Agreement) at GGF(TC)-003101 (preamble); *see also* OTA Ex. 28 (Franchise Agreement); Hr'g Tr. 1/23/19 [ECF No. 62] at 23:10-15 (Longobardi).

[3]  GGF Ex. 38 (Asset Contribution Agreement) at GGF(TC)-003101 (preamble).

[4]  Hr'g Tr. 1/23/19 [ECF No. 62] at 27:19-31:3 (Longobardi); OTA Ex. 29 (Compliance Program manual) at OTABKCY—001704 ("Conflict of Interest," first bullet point) and OTABKCY-001705 ("Conflict of Interest," third bullet point).

things, the franchise's financial condition and the safety of the investment.[5]  In response OTA sent

Essential a notice of default a week later.[6]  Although OTA had the right to terminate the franchise

agreement, it agreed to permit Caufield to sell the business instead.[7]  Caufield then convinced

Paramount Strategies, Inc. ("**Paramount**") to buy Essential's business for $2.145 million on terms

set out in an Asset Sale Agreement.[8]  OTA agreed to the sale subject to several conditions,

including the payment of various Essential debts.  According to Longobardi:[9]

> We [OTA] have a duty to protect our students and our franchisees, the students that
> trust in our brand.  We also knew that there would not be a buyer unless these --
> these liabilities would be cleaned up.  No buyer would buy the business and pay
> any kind of value that made sense to pay off anyone without those liabilities being
> taken care of.

To satisfy OTA, Essential, Paramount and OTA agreed that Paramount would escrow the

$2.145 million purchase price with an additional $150,000 from Essential.[10]  The combined funds

were applied as follows:[11]

(1) $79,512 paid Essential's employees' wages;

(2) $1,344,976.97 repaid OTA-Dallas students' loans to and investments in other entities
Caufield controlled;[12]

(3) $859,216 was paid to OTA for "(i) all sums owing at Closing, including royalties,
marketing, XLT fees, instructor fees, other fees and reimbursements and all accrued fees

---

[5]  Hr'g Tr. 1/23/19 [ECF No. 62] at 30:8-14 (Longobardi); *see also* OTA Ex. 14 (Complaint, *SEC v. Caufield*) at 1.
The SEC lawsuit resulted in a final judgment against Caufield for $741,847.25.  OTA Ex. 15 (Final Judgment) at 7.

[6]  Hr'g Tr. 1/23/19 [ECF No. 62] at 30:24-31:3 (Longobardi).

[7]  *Id.* at 24:7-16 (Longobardi).

[8]  *Id.* at 31:7-14 (Longobardi); OTA Ex. 38 (Escrow Agreement) ¶ A. A copy of the Asset Sale Agreement was not
introduced into the record.

[9]  Hr'g Tr. 1/23/19 [ECF No. 62] at 32:5-10 (Longobardi).

[10]  *Id.* at 34:20-35:17, 61:18-62:7 (Longobardi); OTA Ex. 38 (Escrow Agreement).

[11]  OTA Ex. 38 (Escrow Agreement) at OTAF000144-149 (Schedule 1); Hr'g Tr. 1/23/19 [ECF No. 62] at 42:20-43:20
(Longobardi).

[12]  Online Trading Academy students' claims paid from the escrow fell into two categories: (1) three students who
invested funds through a Caufield entity named Tuition Funding Source, LLC ("**Tuition Funding**") after receiving a
Private Placement Memorandum (the "**PPM**"), and (2) ten students who loaned money to Caufield's sole
proprietorship that operated OTA-Dallas before Essential was formed.  Hr'g Tr. 1/23/19 [ECF No. 62] at 97:10-98:10
(Caufield).

and interest thereon; (ii) Franchisor's legal fees; (iii) the Transfer Fee of $115,000, and (iv) the Transition Fee of $15,000;" and

(4) $16,003 satisfied Essential's vendors' claims.

After these payments and the payment of escrow fees, Essential received less than $5,000 of the purchase price.[13]

OTA terminated the Franchise Agreement once the sale closed.[14]

### B.    Gary Flick's Allegations Against Essential

Gary Flick poured money in Caufield's enterprises well before these events.  After reviewing the PPM he received in early 2016, Flick eventually invested $700,000 in Tuition Funding.[15]

When he did not receive the promised return on his investment, Flick sued Caufield, Essential and Tuition Funding for alleged violations of Section 10(b) of the Securities Exchange Act of 1937, SEC Rule 10b-5, the Texas Securities Act, and the Texas Fraudulent Transfer Act. The complaint also included claims for common-law fraud, fraud by omission, breach of fiduciary duty and breach of contract.[16]  Caufield, Essential and Tuition Funding jointly and severally agreed to repay Flick $546,265.11, a deal memorialized in a proposed agreed final judgment.[17]  But before the district court could consider the agreed judgment, Flick filed an involuntary petition against Essential.  Essential did not contest the involuntary petition and the court ordered relief on November 15, 2018.[18]

---

[13]  Hr'g Tr. 1/23/19 [ECF No. 62] at 70:17-23 (Longobardi).

[14]  OTA Ex. 34 (Termination Agreement).

[15]  Hr'g Tr. 1/29/19 [ECF No. 63] at 101:25-102:2, 106:16-21, 113:12-114:5 (Flick) and 14:2-7 (Caufield); GGF Ex. 31 (PPM and cover e-mail).

[16]  *Flick v. Caufield*, Case No. 3:18-cv-01734-K in the Northern District of Texas, Dallas Division (the "**Lawsuit**") filed July 2, 2018.  GGF Ex. 56.

[17]  OTA Ex. 19 (September 20, 2018 Agreed Final Judgment) at GGF003481-82.

[18]  ECF No. 14.

### III. Legal Analysis

#### A. Preliminary Matters

##### 1. OTA Has Standing to Prosecute the Motion

Flick challenges OTA's standing to seek dismissal or abstention. He contends that OTA holds no claim against the estate because its claims were satisfied as part of the prepetition sale to Paramount. Flick also argues that the possibility that the trustee will sue to avoid prepetition transfers to OTA as preferential under 11 U.S.C. §547 is insufficient to confer standing to prosecute the Motion.

OTA responds that it holds claims for indemnification and attorneys' fees under the Franchise Agreement, the Asset Sale Agreement and the Escrow Agreement, and so is a creditor of the estate. Longobardi testified that OTA believes that Essential owes it "[w]ell in excess of $100,000," comprising legal fees of nearly $21,000 incurred in connection with the sale of Essential's business and over $80,000 related to the involuntary proceeding.[19]

OTA plainly holds claims against the estate. The Franchise Agreement's indemnification provision required Essential "to protect, defend and indemnify [OTA] … and hold [it] harmless from and against any and all costs and expenses actually incurred … including those incurred pursuant to the settlement … arising out of or in connection with the Franchised Business…."[20] The Franchise Agreement also provides that Essential's obligation to indemnify it survives termination.[21] Based on Longobardi's testimony, OTA incurred about $21,000 in legal fees in connection with the sale of Essential's business, fees for which it may seek indemnity from

---

[19] Hr'g Tr. 1/23/19 [ECF No. 62] at 41:9- 42:19, 74:5-75:25 (Longobardi).

[20] OTA Ex. 28 (Franchise Agreement) at OTAF000077 (§ 16.2).

[21] *Id.* at OTAF000033 (Post Termination Provisions).

Essential.  Although Flick argues to the contrary, nothing in the record indicates that OTA waived its right to indemnification.[22]

Similarly unpersuasive is Flick's argument that OTA's claims all were paid in full as part of the sale.  According to the Escrow Agreement, OTA received $859,216 "as payment for (i) all sums owing at Closing, including royalties, marketing, XLT fees, instructor fees, other fees and reimbursements and all accrued fees and interest thereon; (ii) Franchisor's legal fees…."[23]  Flick contends that the phrase "all sums owing" can only mean that the $859,216 OTA received was full and final satisfaction of all its claims against Essential.  But that misreads the Escrow Agreement. The term "all sums owing" modifies only royalties, marketing, XLT fees, instructor fees, and other fees and reimbursements; it does not modify "legal fees," and the two provisions are clearly independent as indicated by separate romanettes.  And, as Mr. Longobardi testified, OTA is claiming indemnity for legal fees it incurred both before and *after* the closing.

Similarly unpersuasive is Flick's argument that the Franchise Agreement's indemnification does not cover the attorneys' fees arising from OTA's willful misconduct in directing the distribution of the sale proceeds.  Although indemnitees generally cannot recover fees incurred defending claims for damages resulting from their wrongful acts, the evidentiary record does not support a finding that OTA's actions in connection with the Paramount sale bar its indemnification.

Finally, that OTA may be a target of a preference action at some point does not deprive it of standing to move to dismiss the case, especially given its claim against the estate.[24]

---

[22] OTA Ex. No. 34; *see also* Hr'g Tr. 1/23/19 [ECF No. 62] 43:24–44:1 (Longobardi).

[23] OTA Ex. 38 (Escrow Agreement) at OTAF000148 (§ 3).

[24] This Memorandum Opinion is without prejudice to any party's right to challenge the extent or validity of any claims alleged during the pendency of the bankruptcy case or the trustee's ability to seek to recover avoidable transfers from OTA under chapter 5 of the Bankruptcy Code.

In summary, OTA has standing to prosecute the Motion.[25]

### 2. The Motion was Timely

Flick also argues that the Motion was untimely because it was not filed within twenty-one days of service of the summons and involuntary petition, as Bankruptcy Rule 1011(b) requires. But OTA is not contesting entry of the order for relief; rather it is requesting that the case be dismissed under 11 U.S.C. § 707(a). Accordingly, entry of the order for relief did not moot the Motion.

### B. OTA's Motion to Dismiss

Under 11 U.S.C. § 707(a), the court "may dismiss a cause under this chapter only after notice and a hearing and only for cause…." "Courts have broad authority to determine what is cause for dismissal under § 707(a): '[C]ause is any reason cognizable to the equity power and conscience of the court as constituting an abuse of the bankruptcy process.'"[26] This can include prepetition bad-faith conduct, postpetition bad-faith conduct or petitions that simply serve no legitimate bankruptcy purpose.[27]

OTA alleges as cause for dismissal that Flick does not hold a claim against Essential, the bankruptcy case is nothing more than an extension of a two-party dispute, and the equities of the case favor dismissal. None of these challenges have merit.

### 1. Flick Holds a Claim Against Essential

OTA gives a detailed history of Flick's relationship with Tuition Funding, including the Lawsuit. It intimates that the agreed final judgment was reached under suspicious circumstances.

---

[25] Post-hearing, OTA timely filed its claim against the estate alleging $425,429.65 for "certain costs and expenses" arising under the parties' various agreements. Claim No. 7-1, filed April 10, 2019.

[26] *Krueger v. Torres (In re Krueger)*, 812 F.3d 365, 370 (5th Cir. 2016) (quoting *Little Creek Dev. Co. v. Commonwealth Mortg. Co. (In re Little Creek Dev. Co.)*, 779 F.2d 1068, 1071 (5th Cir. 1986)).

[27] *Id.* (citing cases).

OTA focuses on these facts: (i) Caufield's negotiation of the agreement on Essential's behalf without the benefit of counsel, (ii) the parties' signing the agreement only days before Flick filed the involuntary petition and (iii) Caufield's alleged failure to read or understand the document before signing it on Essential's behalf. None of these arguments are persuasive.

The record does not support OTA's allegation that Flick manufactured a claim against the estate in order to force Essential into bankruptcy. The evidence established his investment of substantial sums in Caufield's financial education enterprise. Schedule E/F prepared by Caufield and filed on January 22, 2019 also lists Flick as an unsecured creditor with a $546,265.11 claim, an amount that corresponds to the agreed final judgment.[28] No evidence supports a finding that Essential scheduled Flick's claim because of collusion between Caufield and Flick.

Caufield also testified that he not only negotiated the terms of the settlement, but he also reviewed multiple drafts of the settlement before he signed it.[29] Caufield is not unsophisticated and the record supports a finding that he was thoroughly familiar with and understood the agreement. Because "[u]nder elementary principles of contract law, one is presumed to have read a contract that one signs: A person who signs a written instrument is presumed to know its contents and cannot avoid its obligations by contending that he did not read it, or that it was not explained or that he did not understand it,"[30] Caulfield and Essential are bound by it.

---

[28] ECF No. 56 at 3 (§ 3.6). Caufield testified that Essential does not dispute the claim and that it was scheduled as unliquidated due only to the continued accrual of interest. Hr'g Tr. 1/29/19 [ECF No. 63] at 40:5-41:21,100:13-101:8 (Caufield).

[29] Hr'g Tr. 1/29/19 [ECF 63] at 34:22-40:4 (Caufield).

[30] *In re Cajun Electric Power Coop., Inc.*, 791 F.2d 353, 359 (5th Cir. 1986) (quotations omitted).

### 2. The Bankruptcy Case Serves a Legitimate Purpose and is Not Merely an Extension of a Two-Party Dispute

OTA also argues that the bankruptcy case serves no legitimate purpose. It suggests that relatively few creditors have valid claims and therefore no parties will be harmed by dismissal. OTA opines that most claims scheduled by Essential or filed against the estate are not enforceable obligations.

But Essential's bankruptcy schedules and the Official Claims Register reveal the existence of presumptively valid claims against the estate, none of which will receive a distribution for lack of distributable assets in consequence of the prepetition sale of Essential's assets.[31] The record supports a conclusion that permitting the chapter 7 trustee to evaluate the scheduled and filed claims and the propriety of the prepetition transactions is in the best interest of all creditors.

### 3. The Record Does Not Support a Finding that the Case was Filed in Bad Faith; the Equities of the Case Do Not Favor Dismissal

The bad faith necessary to support dismissal of an involuntary case rests on a finding that the petitioning creditor acted with wrongful motives, wrongful objectives or both.[32] The Fifth Circuit has characterized bad faith for the purpose of evaluating involuntary petitions as those "'motivated by ill will, malice or for the purpose of embarrassing or harassing the debtor[s].'" Too, many courts have adopted "'a presumption that the petitioning creditor … acted in good faith in filing an involuntary petition.'"[33] No compelling evidence supports a finding that Flick acted

---

[31] OTA's post-hearing brief [ECF No. 65] unilaterally deems "legitimate" at least two claims against the estate: (1) KRLD for $13,500, and (2) the Texas Comptroller for $19,193. The Frisco RoughRiders, LP also filed a claim, which OTA did not have the opportunity to review. *Id.* ¶ 8 n.2-3. Five additional claims were filed after OTA submitted its post-hearing brief, including claims by OTA, Flick and two apparently unrelated third parties.

[32] *Aigner v. McMillan*, 2013 WL 2445042, at *4 (Bankr. N.D. Tex. June 4, 2013).

[33] *McMillan*, 2013 WL 2445042, at *5 (citing *In re Synergistic Techs., Inc.*, 2007 WL 2264700, at *6–7 (Bankr. N.D. Tex. Aug. 6, 2007)).

willfully or wrongfully and so the record does not support a finding that he sought involuntary relief in bad faith.

Flick invested substantial sums in Caufield's enterprises but recovered nothing in the wake of the Paramount sale. OTA decided which Essential creditors would be paid from the proceeds of the prepetition sale of Essential's business and itself received most of the sales proceeds in preference to Flick and other unpaid prepetition creditors. Flick's involuntary petition preserved those avoidance claims for a chapter 7 trustee's review and, if appropriate, pursuit. Flick's prepetition demand letter to OTA threatening to file the involuntary petition unless he was paid does not change this.[34] The letter was aggressive but alone does not support a finding that Flick filed the involuntary petition in bad faith or solely as a litigation tactic.

To summarize, Flick did not commence this bankruptcy proceeding in bad faith and the equities of the case do not support dismissal.

### C. OTA's Request for Abstention

In the alternative to dismissal, OTA asks the court to abstain from hearing the bankruptcy case under 11 U.S.C. § 305(a), which provides that:

> (a) The court, after notice and a hearing, may dismiss a case under this title, or may suspend all proceedings in a case under this title, at any time if—
>
> > (1) the interests of creditors and the debtor would be better served by such dismissal or suspension; ....

Abstention from hearing a properly filed bankruptcy case under § 305(a)(1) is an extraordinary remedy and requires more than a simple balancing of harm to the debtor and creditors—the interests of both the debtor and its creditors must be served by abstaining.[35] The moving party bears the burden to demonstrate that dismissal benefits the debtor and its creditors.

---

[34] OTA Ex. 31 (Demand Letter).

[35] *In re Acis Capital Management, L.P.*, 584 B.R. 115, 145 (Bankr. N.D. Tex. 2018) (citing cases).

Courts consider the facts of each case to determine whether abstention is appropriate.[36] Among the factors to be weighed in considering abstention under 11 U.S.C. § 305(a) are: (1) the economy and efficiency of administration; (2) whether another forum is available or proceedings already are pending in a state court; (3) whether federal proceedings are necessary to reach a just and equitable solution; (4) whether there is an alternative means of achieving an equitable distribution of assets; (5) whether the debtor and creditors are able to agree on a less expensive out-of-court arrangement; (6) whether a non-federal insolvency has proceeded so far that it would be costly to start anew in bankruptcy court and (7) the purpose for which bankruptcy jurisdiction has been sought.[37] All factors are considered, but not all are given equal weight in the court's analysis.[38]

### 4. Factor 1: The Economy and Efficiency of Administration

The evidence shows that the bankruptcy court is the most economic and efficient forum to resolve this dispute. Essential liquidated its assets prepetition and paid creditors at OTA's direction. Because not all creditors were paid in full, the chapter 7 trustee must review each of those payments to determine whether the estate has viable causes of action against transferees to allow recovery that will benefit all creditors. Otherwise, it is likely that the prepetition sale and the selective distribution of proceeds would either go unreviewed or be the subject of protracted litigation, potentially before more than a single court. Although Flick and other unpaid creditors may be able to employ state law remedies to address the apparent inequality in distribution among creditors, this court is a superior forum for the claims and the parties because of the Bankruptcy Code's remedies.

---

[36] *Acis Capital Management,* 548 B.R. at 145.

[37] *In re Texas EMC Mgmt., LLC,* 2012 WL 627844, at *3 (Bankr. S.D. Tex. Feb. 24, 2012).

[38] *Id.*

**5. Factors 2: Whether Another Forum is Available or There are Already Proceedings Pending in a State Court; and Factor 6: Whether a Non-Federal Insolvency has Proceeded So Far That it Would be Costly to Start Anew in Bankruptcy Court**

Although a proceeding involving Essential is already pending in the District Court, there is no reason to believe it would be a more effective means of resolving this issue, particularly because OTA is not a party to the Lawsuit.  The District Court vacated at the parties' request the agreed final judgment in the Lawsuit due to the intervening bankruptcy.  The District Court later administratively closed the case citing the imposition of the automatic stay.[39]

Although that forum may be appropriate for resolving Flick's claims against Caufield, Essential and Tuition Funding, the other unpaid creditors are not parties to the Lawsuit and likely cannot be made parties to it.

**6. Factors 3-5: Whether Federal Proceedings are Necessary to Reach a Just and Equitable Solution; Whether There is an Alternative Means of Achieving an Equitable Distribution of Assets; and Whether Essential and Creditors are Able to Work Out a Less Expensive Out-of-Court Arrangement**

A federal bankruptcy proceeding is necessary to achieve an equitable result in this case. When Essential's assets were sold prepetition, OTA played a role in selecting creditors to be paid and amounts they would receive.  The chapter 7 trustee can investigate and determine whether the prepetition payment scheme was equitable.

The record also is replete with evidence of the bitter relationship between Flick and OTA, as amply shown by the bad-faith allegations both parties lodged.  An out-of-court arrangement of the numerous parties' interests is unlikely.

---

[39]  March 12, 2019 Minute Entry in 18-cv-01734, ECF No. 36.

### 7. Factor 7: The Purpose for Which Bankruptcy Jurisdiction Has Been Sought

Finally, the record shows that Flick filed the involuntary petition to preserve avoidance actions, a valid basis for seeking bankruptcy court jurisdiction.

In summary, OTA has not proven that Essential and its creditors would be better served outside of bankruptcy and abstention is not proper.

## CONCLUSION

The Motion is denied in its entirety. OTA's counsel is directed to prepare a form of order, circulate it to opposing counsel for review and upload it within 14 days of entry of this Memorandum Opinion. If the parties are unable to agree to a form of order, each party shall provide to the Courtroom Deputy its preferred from of order with an explanation of why its proposed form is proper.

### # # # END OF MEMORANDUM OPINION # # #